**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

TOMAS ALEJANDRO MENDEZ-
ALCARAZ,
                    *Petitioner,*

            v.

ALBERTO R. GONZALES,* Attorney
General,
                    *Respondent.*

No. 04-74268

Agency No.
A90-333-894

OPINION**

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
November 14, 2005—Portland, Oregon

Filed October 2, 2006

Before: Warren J. Ferguson, Andrew J. Kleinfeld, and
Susan P. Graber, Circuit Judges.

Opinion by Judge Kleinfeld

---

*Alberto R. Gonzales is substituted for his predecessor, John Ashcroft, as Attorney General of the United States, pursuant to Fed. R. App. P. 43(c)(2).

**We publish pursuant to Circuit Rule 36-2(g).

17175

**COUNSEL**

Philip James Smith (argued), Nicole Hope Nelson (briefed), Hecht & Smith, LLP, Portland, Oregon, for the petitioner.

Janice K. Redfern (argued), John C. Cunningham (briefed), Office of Immigration Litigation, U. S. Department of Justice, Washington, D.C., for the respondent.

## OPINION

KLEINFELD, Circuit Judge:

The BIA correctly dismissed as untimely Mendez-Alcaraz's motion to reconsider.

## Facts

Mendez-Alcaraz, an alien with lawful permanent residence status, pleaded guilty in 1996 to sexual abuse of a minor.[1] He was sentenced to 75 months in prison and 120 months of "post-prison supervision." He spent three years in a juvenile detention facility and another three in a state prison. When his imprisonment for sexual abuse of a minor ended, the INS took Mendez-Alcaraz into its custody and sought removal based on the conviction.[2] Mendez-Alcaraz conceded removability, designated Mexico as the country to which he would be removed, and stated that he wished to apply for waiver of deportation. He was 16 when he committed the felony, 23 when he conceded removability and waived appeal. There is, and was at the time of Mendez-Alcaraz's guilty plea to sexual abuse of a minor, no discretionary relief from removal available to an aggravated felon who had served a prison term of five years or more.[3]

---

[1] Or. Rev. Stat. § 163.427.

[2] 8 U.S.C. § 1227(a)(2)(A)(iii).

[3] Pub. L. No. 101-649, § 511, 104 Stat. 5052 (amending 8 U.S.C. § 1182(c)); *INS v. St. Cyr*, 533 U.S. 289, 297 (2001); *United States v. Velasco-Medina*, 305 F.3d 839, 850 (9th Cir. 2002).

At the time of his removability hearing, we had not yet held that sexual abuse of a minor was an "aggravated felony" for purposes of this statute. (The statute was amended expressly to make it one, but the effective date of the amendment was after Mendez-Alcaraz's guilty plea.[4]) The immigration judge ("IJ") held that the crime was an aggravated felony, but recognized that it was an arguable issue, saying "I could be wrong on this. There is a significant legal issue. Do you understand that?," to which Mendez-Alcaraz responded "yes."

The IJ ordered Mendez-Alcaraz removed to Mexico. Mendez-Alcaraz expressly waived appeal after conferring with counsel. He moved to Mexico in January 2003, in compliance with the order of removal. Mendez-Alcaraz's brief alleges that he has neither reentered nor attempted to reenter the United States since that time.

Fourteen months after the hearing and removal order (and waiver of appeal), Mendez-Alcaraz moved for reconsideration, on the theory that when he pleaded guilty to sexual abuse of a minor, it was not an aggravated felony. The IJ denied the motion because "[t]he same arguments were raised at trial. Respondent could have reserved and filed appeal. There is nothing 'new' or 'different' now." Mendez-Alcaraz appealed the denial of reconsideration to the BIA. It dismissed, agreeing with the IJ's decision, and adding several alternative grounds: (1) the IJ and BIA had no jurisdiction to grant reconsideration because Mendez-Alcaraz had been removed to Mexico;[5] (2) the motion was untimely, having been filed long after the 30 day time limit;[6] and (3) the crime was retroactively

---

[4]8 U.S.C. § 1101(a)(43)(A).

[5]*See* 8 C.F.R. § 1003.2(d) ("A motion to reopen or a motion to reconsider shall not be made by or on behalf of a person who is the subject of exclusion, deportation, or removal proceedings subsequent to his or her departure from the United States."); 8 C.F.R. § 1003.23(b)(1) (same).

[6]8 C.F.R. § 1003.23(b)(1).

reclassified as an aggravated felony and he served five years or more.[7] Mendez-Alacaraz petitions for review.

## Analysis

We must first decide whether Mendez-Alcaraz's removal to Mexico deprives us of jurisdiction to decide this petition for review from the denial of his motion for reconsideration. The answer would have been that it did, before the "transitional rules" period[8] under IIRIRA ended and the "permanent rules" period[9] began, on April 1, 1997.[10] The IIRIRA "permanent rules"[11] do not include the old jurisdiction-stripping provision for excluded, deported, or removed aliens.[12] "We now may entertain a petition after the alien has departed."[13]

The BIA based its dismissal of Mendez-Alcaraz's appeal

---

[7]*See Aragon-Ayon v. INS*, 206 F.3d 847, 853 (9th Cir. 2000) ("Congress intended the 1996 amendments to make the aggravated felony definition apply retroactively to all defined offenses whenever committed, and to make aliens so convicted eligible for deportation notwithstanding the passage of time between the crime and the removal order.").

[8]8 U.S.C. § 1105a(c) (1994), *as modified by* IIRIRA § 309(c), Pub. L. No. 104-208, 110 Stat. 3009; *see also Contreras-Aragon v. INS*, 852 F.2d 1088, 1091 n. 1 (9th Cir. 1988), *superseded by statute*, Pub. L. No. 104-208, 110 Stat. 3009, *as recognized in Zazueta-Carrillo v. Ashcroft*, 322 F.3d 1166, 1170-71 (9th Cir. 2003).

[9]8 U.S.C. § 1252(d).

[10]8 U.S.C. § 1105a(c)(1994), *as modified by* IIRIRA § 309(c), Pub. L. No. 104-208, 110 Stat. 3009 (providing for the effective date of the permanent rules).

[11]8 U.S.C. § 1252(d).

[12]*Zazueta-Carrillo*, 322 F.3d at 1171.

[13]*Id. Accord Moore v. Ashcroft*, 251 F.3d 919, 922 (11th Cir. 2001) (holding that, after IIRIRA, a petitioner's removal from the United States does not render the case moot); *Tapia Garcia v. INS*, 237 F.3d 1216, 1217 (10th Cir. 2001) (holding that "deportation no longer forecloses judicial review").

on three independent grounds. Because untimeliness is dispositive, we need not reach the other issues.[14]

[1] Though Mendez-Alcaraz missed the 30 day deadline for filing his motion, he argues that the deadline should be equitably tolled. The deadline can be equitably tolled for various reasons, such as that "despite all due diligence, the party invoking equitable tolling is unable to obtain vital information bearing on the existence of the claim."[15] Tolling requires that "his or her ignorance of the limitations period was caused by circumstances beyond the party's control, and that these circumstances go beyond a garden variety claim of excusable neglect."[16]

Mendez-Alcaraz argues that the IJ deprived him of the knowledge he needed by telling him that his crime was indeed an aggravated felony, and "[l]iving in Mexico, Mr. Mendez was unaware" of two decisions that would have made aggravated felony classification arguable, and "through reasonable diligence could not have discovered" these cases.

---

[14]The dissent raises issues that Petitioner did not, and that have nothing to do with the timeliness issue upon which we have decided this case. Generally, we need not and do not consider issues that are neither preserved nor raised on appeal or by petition for review. *United States v. Montoya*, 45 F.3d 1286, 1300 (9th Cir. 1995). Even if the issues were preserved and raised, they would not avail Petitioner because a criminal conviction cannot be attacked collaterally in a deportation proceeding. *Ortega de Robles v. INS*, 58 F.3d 1355, 1358 (9th Cir. 1995). Finally, even if the issues were preserved and raised and could be reached, the dissent's suggestion that the unconstitutionality of Measure 11 is "*easily* extrapolated" from *In re Gault*, 387 U.S. 1 (1967) and *Kent v. United States*, 383 U.S. 541 (1966) is unsupported. *Alvarado v. Hill*, 252 F.3d 1066, 1068-69 (9th Cir. 2001), held that Measure 11 is not contrary to clearly established Supreme Court precedent, based on those very two cases. *Id.*

[15]*Socop-Gonzalez v. INS*, 272 F.3d 1176, 1193 (9th Cir. 2001) (en banc) (quotation marks and brackets omitted).

[16]*Id.* at 1193 (citation and internal quotations marks omitted).

**[2]** We cannot accept this argument. There is no claim that the internet and law libraries do not exist in Mexico. Moreover, the IJ expressly told Mendez-Alcaraz that he "could be wrong on this. There is a significant legal issue," before asking if Mendez-Alcaraz wanted to appeal. We further note that Mendez-Alcaraz had counsel then and now.

**PETITION DENIED.**

FERGUSON, Circuit Judge, dissenting:

### I.

The government removed Tomas Mendez-Alcaraz ("Mendez") from this country based on a criminal conviction that violated his procedural due process rights under the Fourteenth Amendment to the U.S. Constitution. Because such an unconscionable result cannot be affirmed, I dissent.

### II.

Shortly after his sixteenth birthday, petitioner Mendez, a lawful permanent resident of the United States, was subjected to an unlawful application of state law that cost him not only six years of his freedom, but also his ability to stay in the United States.

Although the laws of the United States and the state of Oregon, where Mendez resided, categorized him as too young to vote in elections, purchase cigarettes, consent to a sexual act, or possess alcohol,[1] Oregon's Measure 11 law required, with-

---

[1] Or. Rev. Stat. § 247.015 (2006) (must be over eighteen to register to vote); Or. Rev. Stat. § 167.401 (2006) (illegal for minor under eighteen to purchase or possess tobacco); Or. Rev. Stat. § 163.315(a) (2006) (person under eighteen incapable of consenting to a sexual act); Or. Rev. Stat. § 471.430 (2006) (illegal for person under twenty-one to purchase or possess alcohol).

out any legal process, that he be treated as an adult in the criminal justice system, subject to the mandatory minimum sentencing guidelines for sex criminals. Unlike other juveniles charged with crimes in Oregon, Mendez had no hearing to determine whether he should be tried as an adult.

The legal consequences of Mendez's delinquency were so drastic that he had a right to a hearing to determine whether he should have been tried as an adult. As the Supreme Court has noted, "[T]here is no place in our system of law for reaching a result of such tremendous consequences without ceremony—without hearing." *Kent v. United States*, 383 U.S. 541, 554 (1966).

### III.

On the afternoon of July 20, 1995, Aynna Glover and Jenny Franklin, ages eleven and twelve, respectively, stopped at Mendez's home on their way to a swimming pool. They had met Mendez approximately one week earlier and evidently were at the residence to meet some other friends before going to the pool.

Shortly after arriving at the Mendez residence, Franklin went with Mendez's brother into another room, leaving Glover and Mendez alone together in the living room. They began playfully wrestling and pinching each other, which eventually lead to kissing.

There is some dispute as to what happened next. Glover contends that Mendez held her down and forcibly inserted his finger into her vagina. Mendez admits to digitally penetrating Glover, but contends that the act was consensual[2] and that he asked Glover first. Franklin told the investigating detective that she had peeked in on Glover and Mendez and that "they

---

[2]Of course, as a matter of law, Glover could not have consented since she was only eleven years old. Or. Rev. Stat. § 163.315(a) (2006).

were both on the couch lying down making out." She also said she did not hear Glover call for help. Neither did Glover seem upset when she told Franklin about the incident after leaving the house. Glover's father later told an investigating detective that he did not notice any emotional or psychological damage to his daughter. Mendez claimed he did not know Glover was only eleven.[3]

Over one month later, Glover reported the incident to the police after she learned that her parents had found out about it. Mendez was apprehended and charged with first degree unlawful sexual penetration, first degree sexual abuse, and first degree attempted rape.[4]

Pursuant to Oregon's Measure 11 law, sixteen year-old Mendez was automatically processed in the adult criminal justice system without any hearing regarding the suitability of that forum. He pleaded guilty to one count of sexual abuse[5] in exchange for the dismissal of the first and third charges.

---

[3]None of this should be read as minimizing Mendez's illegal and irresponsible conduct. There is no excuse for a 16 year old boy to engage in sexual activity with an 11 year old girl, regardless of the circumstances. Mendez himself recognizes as much. In his psychological evaluation, Mendez showed "no indications of denial or minimization of the seriousness of his conduct. He acknowledge[d] its wrongfulness and expresse[d] a willingness to participate in appropriate treatment." These additional facts, however, do highlight the importance of individualized hearings that consider all factors and effects of a juvenile's conduct prior to transferring him or her to adult court.

[4]Or. Rev. Stat. § 163.411 (2006); Or. Rev. Stat. § 163.427 (2006); Or. Rev. Stat. § 163.375 (2006).

[5]Or. Rev. Stat. § 163.427 (2006) reads, in relevant part:

"(1) A person commits the crime of sexual abuse in the first degree when that person:

"(a) Subjects another person to sexual contact and: "(A) The victim is less than 14 years of age;

. . .

"(2) Sexual abuse in the first degree is a Class B felony."

Using the findings of the staff psychologist who evaluated Mendez, a county pre-sentence investigation unit and diagnostic center "unanimously agreed [that] if this were not a Ballot Measure 11 case, [it] would in fact recommend a probationary sentence" with out-patient treatment in the community. However, because it was a Measure 11 case, the judge sentenced Mendez to the mandatory minimum under Measure 11 for first degree sexual abuse, 75 months imprisonment, as well as 120 months of post-prison supervision. Mendez served three years in a juvenile detention facility and three years in a state prison for adults. He was released on May 22, 2002, a few weeks before his twenty-third birthday.

Seven months after Mendez's release, the Immigration and Naturalization Service (now Immigration and Customs Enforcement) took Mendez, a legal permanent resident of the United States, into custody and sought to have him removed to Mexico based on his sexual abuse conviction. Mendez had no other criminal record.

After a removal hearing before an immigration judge, Mendez was ordered out of the country. He moved with his wife to Baja California, where they currently reside.

## IV.

In 1994, Oregon voters approved Measure 11 by a margin of 65% to 35%. The measure contains two important provisions.[6] First, it requires that juveniles over the age of fourteen

---

[6]As codified at Or. Rev. Stat. § 137.707 (2006), Measure 11 reads, in relevant part:

"(1)(a) Notwithstanding any other provision of law, when a person charged with . . . an offense listed in subsection (4) of this section is 15, 16 or 17 years of age at the time the offense is committed, and the offense is committed on or after April 1, 1995, the person shall be prosecuted as an adult in criminal court.

. . .

charged with enumerated offenses be prosecuted as adults. Or. Rev. Stat. § 137.707(1)(a). Second, it provides for mandatory minimum sentences with no judicial discretion for juveniles convicted of those enumerated offenses. Or. Rev. Stat. § 137.707(2). The measure, including subsequent legislative amendments,[7] is codified at Or. Rev. Stat. § 137.700 (2006), Or. Rev. Stat. § 137.707 (2006), and Or. Rev. Stat. § 137.712 (2006). As of August 2006, the Oregon Department of Corrections reported 662 offenders with Measure 11 convictions who were under age eighteen on the dates of their crimes.[8]

---

"(2) When a person charged under this section is convicted of an offense listed in subsection (4) of this section, the court shall impose at least the presumptive term of imprisonment provided for the offense in subsection (4) of this section. . . .

". . . (4) . . .

"(p) Sexual abuse in the first degree, as defined in ORS 163.427 * * * 75 months[.]"

[7]Oregon House Bill 2379, which is now law, gave judges the power to downwardly depart from the mandatory minimums for certain crimes, including first degree sexual abuse, under certain circumstances. Or. Rev. Stat. § 137.712 (2006).

[8]Or. Dep't of Corrections, *Offenders with Measure 11 Convictions as of August 1, 2006, Under Age 18 on Date of Crime* (2006), *available at* http://www.oregon.gov/DOC/RESRCH/docs/m11juv.pdf. This document also demonstrates a troubling racial disparity when one compares the statistics for minority offenders to their representations in the general population of Oregon. Although African-Americans make up only 1.8% of the Oregon population, they make up 12.4% of incarcerated Measure 11 juvenile offenders. "Hispanics" make up 9.5% of Oregon's population, but are 13.1% of Measure 11 juvenile offenders. Native Americans make up 1.4% of Oregon's population, but are 2.7% of Measure 11 juvenile offenders. U.S. Census Bureau, *Oregon QuickFacts* (2006), http://quickfacts. census.gov/qfd/states/41000.html. Even more severe racial disparities are not uncommon for juveniles tried as adults, even with non-discretionary or automatic transfer laws. Michael Bochenek, Human Rights Watch, *No Minor Matter: Children in Maryland's Jails* (1999), *available at* http://www.hrw.org/reports/1999/maryland/ (follow "The Disproportionate Impact on Minority Youth" hyperlink); Patricia Allard & Malcolm Young,

Measure 11 arose as part of a national trend in the 1990s towards targeting juvenile offenders, processing them as adults, and increasing the punishments available for them; "Adult time for adult crime," went the slogan. In the last fifteen years, almost every state in the country has made it easier to try children under the age of eighteen in adult criminal courts.[9] This trend reached a fevered pitch in the mid-1990s when our nation's children were labeled "super-predators" by academics,[10] the news media,[11] and even members of Congress,[12]

---

The Sentencing Project, *Prosecuting Juveniles in Adult Court: Perspectives for Policymakers and Practitioners* 9 (2002) ("Statistics like these move us past the time when reasonable people can believe that policing and prosecution practices leading to transfer are even close to the same for children of color as they are for white kids.").

[9]Task Force on Youth in the Criminal Justice System, American Bar Association, *Youth in the Criminal Justice System* 1 (2001) ("Since 1991 almost every state has widened the scope of persons under eighteen who, after being charged with a crime, are processed by adult criminal courts rather than by juvenile or family courts.") (hereinafter *Youth in the Criminal Justice System*); *see generally*, Mike A. Males, *The Scapegoat Generation: America's War on Adolescents* (1996).

[10]*See, e.g.*, John J. Dilulio, Jr., *The Coming of the Super-Predators*, Weekly Standard, November 27, 1995, at 53 ("On the horizon . . . are tens of thousands of severely morally impoverished juvenile super-predators. They are perfectly capable of committing the most heinous acts of physical violence for the most trivial reasons . . . [F]or as long as their youthful energies hold out, they will do what comes 'naturally:' murder, rape, rob, assault, burglarize, deal deadly drugs, and get high.").

[11]*See, e.g.*, Peter Annin, *Superpredators Arrive: Should We Cage the New Breed of Vicious Kids?*, Newsweek, January 22, 1996, at 57. *See also* Jerome Miller, *Riding the Crime Wave: Why Words We Use Matter So Much*, Nieman Reports: The Nieman Foundation for Journalism at Harvard University, Winter 1998, at 47 (analyzing the effects of "super-predator" rhetoric in the media).

[12]*See, e.g.*, House Committee on Economic and Educational Opportunities, Subcommittee on Early Childhood, Youth and Families, *Hearings on the Juvenile Justice and Delinquency Prevention Act,* Serial No. 104-68, 104th Cong., 2d sess., 1996, at 90 (statement of Rep. Bill McCollum, chairman, Subcommittee on Crime, House Judiciary Committee) ("Brace yourself for the coming generation of 'super-predators.' ").

despite the fact that statistics failed to support the claim.[13] Just last year, the U.S. Supreme Court acknowledged a "particular trend in recent years toward cracking down on juvenile crime." *Roper v. Simmons*, 543 U.S. 551, 556 (2005).

This trend represents a sharp departure from the traditional aim of the juvenile justice system, which, since its introduction in Illinois in 1899, has sought to discard the "rigidities, technicalities, and harshness" of the criminal justice system and replace it with treatment and rehabilitation. *In re Gault*, 387 U.S. 1, 15-16 (1967). The juvenile justice system was "rooted in social welfare philosophy rather than in the corpus juris." *Kent*, 383 U.S. at 554-55. Juvenile courts have historically centered on guiding and rehabilitating children for the betterment of themselves and society as a whole. *Id*.

Since at least 1924, the Oregon Supreme Court has noted that "the purpose of the children's court is not to convict or punish, but to protect." *Hills v. Pierce*, 231 P. 652, 654 (Or. 1924). Oregon courts have recognized juvenile procedure as "equitable in that the remedies may be flexible and based upon 'conscience' and judgment, rather than upon more or less rigid rules of law." *State ex rel. Juvenile Dep't v. Reynolds*, 857 P.2d 842, 848 n.11 (Or. 1993) (quoting *State v. Gullings*, 416 P.2d 311, 312 (Or. 1966)). The juvenile justice system has as its "primary objective[s]" the avoidance of "the stigma associated with a criminal conviction" and the emphasis of "rehabilitative efforts." *State ex rel. Juvenile Dep't v. Fitch*, 84 P.3d 190, 195 (Or. Ct. App. 2004); *In re Williams*, 640 P.2d 675, 679 (Or. Ct. App. 1982) ("It is significant that the juvenile court system is generally considered to be more favorable to a child than is the adult court system, because in the former the welfare of the child is the highest concern.").

---

[13]*See, e.g.*, Franklin E. Zimring, *The Youth Violence Epidemic: Myth or Reality?*, 33 Wake Forest L. Rev. 727 (1998) (analyzing juvenile crime statistics and concluding "there never was a general pattern of increasing adolescent violence in the 1980s and 1990s.").

The strong moral, legal, and policy reasons for distinguishing between juvenile delinquents and adult criminals are "too obvious to require extended explanation." *Thompson v. Oklahoma*, 487 U.S. 815, 835 (1988). The Supreme Court has highlighted three such reasons. *Roper*, 543 U.S. at 569-70. First, juveniles lack the maturity and developed sense of responsibility we attribute to adults. *Id*. at 569. Second, they are more susceptible to negative influences and peer pressure than are adults. *Id*. Third, their personality traits are more transitory and less fixed, indicating a higher likelihood of rehabilitation of juveniles than of adults. *Id*. at 570. As the Court noted, "[f]rom a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed." *Id*.

Developmental literature also bears out the conclusion that "adolescents and adults are different in ways that warrant their differential treatment under the law."[14] Laurence Steinberg, an expert on adolescent development and professor of psychology at Temple University, notes, "it is *logically impossible* to make the age of the offender irrelevant in discussions of criminal justice policy."[15]

Juvenile psychological development is pertinent to at least three aspects of the criminal justice process: competency to be prosecuted, culpability for the underlying offense, and amenability to treatment.[16]

---

[14]Laurence Steinberg, Temple University, Congressional Research Briefing, *Should Juvenile Offenders Be Tried As Adults? A Developmental Perspective on Changing Legal Policies* (Jan. 19, 2000), *available at* http://www.jcpr.org/wpfiles/Steinberg_briefing.pdf (hereinafter "Steinberg").

[15]*Id*. at 3 (emphasis added).

[16]Laurence Steinberg & Elizabeth Cauffman, *The Elephant in the Courtroom: A Developmental Perspective on the Adjudication of Youthful Offenders*, 6 Va. J. Soc. Pol'y & L. 389, 398-399 (1999) (hereinafter "Steinberg & Cauffman").

First, youths are more likely to find themselves scared and intimidated by the adversarial nature of adult proceedings. They may lack the capacity to meaningfully contribute to their own defense in such proceedings, and are more likely to defer to authority figures, including prosecutors in plea negotiations.[17]

Second, youths may lack the requisite culpability that the law has long recognized as an essential element of most criminal laws.[18] Many juveniles lack fully-developed, logical decision-making skills and an ability to foresee the future consequences of their behavior.[19]

Third, juvenile development bears on the issue of punishment and amenability to treatment.[20] Juveniles have long been considered more susceptible to rehabilitation than adult offenders, although focusing on individual life experience rather than simply age is the best way to determine appropriate punishment or treatment.[21]

---

[17]Steinberg, *supra*, at 4-5; Thomas Grisso, *The Competence of Adolescents as Trial Defendants*, 3 Psych. Pub. Pol. and L. 3 (1997); Thomas Grisso, et al., *Juveniles' Competence to Stand Trial: A Comparison of Adolescents' and Adults' Capacities as Trial Defendants*, 27 L. and Human Behavior 333 (2003).

[18]Steinberg, *supra*, at 5-6.

[19]Laurence Steinberg & Elizabeth S. Scott, *Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty*, 58 Am. Psychologist 1009 (2003); Juvenile Justice Center, American Bar Association, *Adolescence, Brain Development, and Legal Culpability* (2004), *available at* www.abanet.org/crimjust/juvjus/Adolescence.pdf.

[20]Steinberg, *supra*, at 7.

[21]*Id*. Steinberg and Cauffman conclude that the offender's age is not determinative of amenability to rehabilitation. They argue for an individualized analysis of each offender. Steinberg and Cauffman, *supra*, at 414 ("Amenability decisions should be made on a case-by-case basis and should focus on the prior history, rather than the chronological age, of the offender.").

Both the law and the scientific literature agree that when it comes to crime, juveniles are different.

V.

The United States Supreme Court, the Ninth Circuit, and the Oregon Supreme Court have all held that transferring a child from the juvenile justice system to the adult criminal justice system is an event of such importance that due process requires she or he be given a hearing. *Kent*, 383 U.S. at 554; *Barker v. Estelle*, 913 F.2d 1433 (9th Cir. 1990); *Bouge v. Reed*, 459 P.2d 869 (Or. 1969).

In *Kent*, the Supreme Court dealt with the issue of whether the District of Columbia's transfer law, "read in the context of constitutional principles relating to due process," required the juvenile court to provide the child a hearing prior to waiving its jurisdiction (hence transferring the case to adult criminal court). *Kent*, 383 U.S. at 552, 557. The Court held that it did, noting that "[i]t would be extraordinary if society's special concern for children . . . permitted this procedure" of sending children to adult criminal court without a hearing. *Id.* at 554.

Although *Kent* was arguably decided as a matter of statutory law, the Court has since clarified the Fourteenth Amendment issue, stating that "the basic requirements of due process and fairness [must] be satisfied in such proceedings." *In re Gault*, 387 U.S. at 12. As the Oregon Supreme Court has explicitly recognized, "the intent of the United States Supreme Court, as expressed in [*Kent* and *In re Gault*], is that the due process clause of the Constitution of the United States requires states to accord a hearing before a juvenile can be remanded to the adult criminal process." *Bouge*, 459 P.2d at 870.[22] The Ninth Circuit has also so held. *Barker*, 913 F.2d at

[22]The majority cites *Alvarado v. Hill*, 252 F.3d 1066 (9th Cir. 2001), for the proposition that Measure 11 does not violate the Fourteenth Amend-

1440 ("[D]ue process requires that, before a juvenile can be transferred to an adult court, the juvenile must be given a hearing, effective assistance of counsel, access to records relied on by the court, and a statement of reasons for the juvenile court decision."); *Guam v. Kingsbury*, 649 F.2d 740, 743 (9th Cir. 1981) ("In the context of juvenile certification procedures, due process requires the rights to counsel, to adequate notice and to a statement of reasons at a hearing to determine whether a juvenile is to be tried as an adult.").

The necessity of holding an individualized hearing prior to prosecuting a child as an adult follows logically from the basic legal and developmental tenets of our juvenile justice system. As Dr. Steinberg has noted, "the need for this additional information argues for a more individualized approach to both transfer and sentencing of juveniles, and argues against policies that do not permit such flexibility, such as transfer via legislative exclusion."[23] Mandatory transfer laws that do away with individualized assessments of the child and focus instead on the offense itself are "bad policy from a developmental perspective."[24] For this reason, the American Bar Association and the Institute of Judicial Administration have urged that "no youths fifteen, sixteen or seventeen should be transferred except by a juvenile court judge after a hearing."[25]

---

ment. However, *Alvarado* does not control. The court in *Alvarado*, adopting the standard of review required by AEDPA in a habeas matter, noted that "[t]he question before us is not whether Measure 11 violates due process as that concept might be extrapolated from the decisions of the Supreme Court[;]" the question was whether there had been a violation of *clearly established* federal law. *Id.* at 1068-69. Although the Supreme Court has not explicitly declared Measure 11 unconstitutional, such a conclusion is easily extrapolated from *In re Gault* and *Kent. See, e.g., Bouge*, 459 P.2d at 870.

[23]Steinberg, *supra*, at 7.

[24]*Id.* at 8.

[25]*Youth in the Criminal Justice System*, *supra*, at 1 n.1. In fact, Measure 11 violates three of the seven guiding principles set out by the ABA's

Undoubtedly, many juveniles have attained the maturity, foresight, and responsibility we expect from adults, and they may be prosecuted accordingly. As a general rule, however, Oregon law requires that juveniles receive a hearing prior to being transferred to adult court. Or. Rev. Stat. § 419C.349. Measure 11 removes this protection for juveniles charged with certain crimes. To take such a highly personal and fact-specific inquiry out of the hands of juvenile court judges, as Measure 11 does, violates procedural due process.

But for Measure 11, Mendez would have received a hearing in juvenile court as to whether or not he should have been tried as an adult. Or. Rev. Stat. § 419C.349. The court would have determined whether or not Mendez had "sufficient sophistication and maturity to appreciate the nature and quality" of his conduct and whether or not retaining jurisdiction in the juvenile court would "serve the best interests of the youth and of society." *Id.*

First, the court would have considered Mendez's amenability to treatment and rehabilitation, which his psychological profile indicates was high.[26] Or. Rev. Stat. § 419C.349(4)(a). Second, it would have considered whether the seriousness of Mendez's offense required the protection of the community,

---

Task Force on Youth in the Criminal Justice System. Measure 11 ignores the fact that "developmental differences need to be taken into account at all stages and in all aspects of the adult criminal justice system." Measure 11's mandatory minimums do not let judges "consider the individual characteristics of the youth during sentencing." Measure 11 also makes the "collateral consequences normally attendant to the adult criminal justice process . . . apply to all youth" convicted of certain crimes, including the effects such convictions may have on immigration status, as in Mendez's case. *Id.* at 7.

[26]Mendez's psychological evaluation states, "He is highly likely to benefit from any form of counseling afforded to him, and is amenable to community based outpatient programming. The likelihood of recidivism, already low due to the situational nature of his offense, would be even lower were he involved in treatment."

Or. Rev. Stat. § 419C.349(4)(b), which it likely did not given his "low recidivism potential and a high likelihood of benefitting from treatment." Third, the court would have considered whether Mendez's conduct was aggressive, violent, premeditated or willful. Or. Rev. Stat. § 419C.349(4)(c). Witness Franklin told investigators Mendez's conduct was none of these, and Mendez's psychological evaluation indicates that "his admitted sexual misconduct was situational rather than being indicative of a pattern of deviant sexual thinking and conduct." Fourth, the court would have considered Mendez's emotional and mental health. Or. Rev. Stat. § 419C.349(4)(d)(B). The psychological evaluation indicates that Mendez suffered from acute depression and his "childhood adjustment was marred by physical and emotional abuse."[27] Fifth, but for Measure 11, the juvenile court would have looked at his prior criminal/delinquent record. Or. Rev. Stat. § 419C.349(4)(e). Mendez had no prior record. Sixth, the court would have weighed the gravity of injury caused by the offense. Or. Rev. Stat. § 419C.349(4)(f). According to the victim's father she suffered no emotional damage, and, according to her friend, the victim continued to flirt with Mendez weeks after the incident.

Of course, it is not our role to decide on the merits whether or not Mendez should have been tried as an adult or as a child, "but there is no place in our system of law for reaching a result of such tremendous consequences . . . without hearing." *Kent*, 383 U.S. at 554. A juvenile court judge should have had the opportunity to consider whether Mendez should have been

---

[27]Child psychologists have noted the effects that child abuse may have on a victim's own sexual misconduct. Marty Beyer et al., *More Than Meets the Eye: Rethinking Assessment, Competency and Sentencing for a Harsher Era of Juvenile Justice* 12 (2002) ("Early trauma appears to be a significant, but often untreated, factor in sexual acting out by teenagers. The insistence of many professionals that children charged with sex offenses are predatory, using an adult model, fails to recognize their own sexual victimization and the necessity of recovering from it. Molesting younger children is a repetition of the sadistic treatment they received.").

prosecuted as an adult or kept in the juvenile system. In the end, that decision was made by the prosecutor, whose charging discretion determined which court retained jurisdiction over Mendez.[28] Fundamental fairness and the tenets of juvenile justice require this decision be made not by a prosecutor with an interest in the case, but by an impartial judge in considering the interests of both society and the child.

## VI.

In the end, this is a case of a young man suffering expulsion from this country for a crime he committed when he was a child. Let there be no doubt about it: his behavior was indisputably wrong and deeply troubling. But also troubling is Oregon's abandonment of individualized analysis and the withholding of children's due process rights.

It is difficult to discern who in this case has benefitted from such a constitutionally offensive law. Certainly not Mendez, who lost six years of his life and the right to live in the United States. Certainly not the people of Oregon, who spent large amounts of tax dollars to incarcerate an individual with no prior criminal record, whose psychological evaluation found a young man with a low likelihood of recidivism that "acknowledge[d] the wrongfulness of his behavior, [was] capable

---

[28]Prosecutors and judges alike recognize the enormous power Measure 11 gives to charging decisions. One Oregon prosecutor "recognizes that Measure 11 gives us amazing authority. With it comes corresponding responsibility and we exercise discretion in charging and negotiating judiciously." Scott Heiser, *quoted in* League of Women Voters of Oregon Education Fund, *Effects of Measure 11 on Juvenile Justice in Oregon* (2000), http://www.lwvor.org/documents/JuvenileJustice2000.htm. Judges have also expressed concern over the effect of Measure 11 on plea negotiations between juveniles and prosecutors. *Id.* ("[Benton County] Judge [Robert S.] Gardner says that overcharging puts pressure on the defendant and gives the district attorney great power in negotiations. [Deschutes County Circuit Court] Judge [Michael] Sullivan notes that Measure 11's mandatory sentences 'are so severe that defendants with an arguable defense will almost always take a negotiated plea and forego the trial.' ").

of generating victim empathy, and asserte[d] that he [was] willing to participate in corrective counseling."

Ten years ago, the victim's father, seeking treatment for Mendez rather than incarceration, told an investigator, "We just do not want to see Tomas' life messed up." Measure 11, by rejecting the foundational tenets of our juvenile justice system and violating the Fourteenth Amendment, did just that.